UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

CRIMINAL ACTION NO. 5:19-CR-00101-KKC-MAS

UNITED STATES OF AMERICA                                             PLAINTIFF

V.        **UNITED STATES'S OPPOSITION TO DEFENDANT'S
              MOTION TO REVOKE DETENTION ORDER**

MAHMOUD SHAKER SHALASH                                            DEFENDANT

\* \* \* \* \* \*

The United States hereby opposes Defendant Shalash's motion to revoke the Detention Order issued by the Magistrate Judge on May 17, 2019. At Shalash's detention hearing, the Magistrate Judge appropriately weighed the evidence and arguments relating to Shalash's participation in a murder for hire plot. The Magistrate Judge was correct to conclude that no combination of release conditions would reasonably assure Shalash's future appearance or the safety of Shalash's would-be victim or other members of the community. After the detention hearing, the grand jury returned an indictment charging Shalash with this offense and participating in a conspiracy to kidnap the potential victim. As discussed below, this indictment and this additional charge only strengthen the conclusion that Shalash should be detained pending his trial.

## ARGUMENT

A defendant should be detained when no "combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community . . . ." 18 U.S.C. § 3142(e)(1). Clear and convincing evidence must support a finding that detention is necessary to ensure a person's safety. *See* 18 U.S.C. § 3142(f). A preponderance of the evidence is necessary to sustain an order detaining a defendant based on risk of nonappearance. *See, e.g., United States v. Patriarca*, 948 F.2d 789, 793 (1st Cir. 1991). Both standards require consideration of available information concerning: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(1)-(4). In this case, the Magistrate Judge considered all available information, gave due weight to each statutory factor, and appropriately concluded that detention was necessary under either standard.

### A.   Risk of Danger

The Magistrate Judge concluded that clear and convincing evidence of Shalash's danger established that release conditions would not be sufficient to reasonably assure the safety of another person. [DE 21: Detention Order at 11-12.] The Magistrate Judge determined that three of the four § 3142(g) factors weighed heavily in favor of this conclusion. [*Id.* at 6-12.] Each of these three factors is discussed below.

1. <u>Nature and Circumstances of the Offenses Charged</u>

Through a complaint affidavit and testimony at the detention hearing, FBI Task Force Officer William Jackson provided a significant amount of information about the nature and circumstances of the offenses charged. These events began during an investigation in which a confidential human source ("CHS") contacted Shalash. [DE 20: Det. Hr'g Tr. at 13.] The investigation initially covered matters other than kidnapping and murder for hire. [*Id.* at 44] During communications that spanned March 12 through May 3, 2009, Shalash sought the CHS's assistance in finding two individuals who owed money to Shalash and others. Through discussions of the first individual ("Victim 1"), Shalash became aware that the CHS was willing to kidnap and physically harm individuals over unpaid debts. As those discussions progressed to the second individual ("Victim 2" or "L.E."), Shalash willingly introduced the CHS to codefendant Fnu Sadiqullah, who wanted the CHS to do exactly that. Shalash also agreed to facilitate the CHS's discussions with Sadiqullah and his associates and to assist the CHS in locating L.E.

On March 12, 2019, Shalash met with the CHS and told the CHS about a matter that he stated he did not want to discuss over the phone. [*Id.* at 14.] Shalash proceeded to tell the CHS about Victim 1, whom Shalash believed owed him approximately $80,000. [*Id.* at 16; DE 1: Criminal Complaint ¶ 7.] Shalash asked the CHS to find Victim #1 and possibly retrieve Shalash's money. [DE 20: Det. Hr'g Tr. at 17.] The CHS opined that Victim #1 "needs to do something more than just cough up the money." [DE 1: Criminal Complaint at ¶ 7.] Later in the discussion, Shalash brought up a "friend" who "told me he wanted to bring him alive or dead just to convey the message." [*Id.*] The CHS responded,

"I know guys that will kill you for that kind of money. [*Id.*] As the discussion progressed, the CHS asked Shalash if he wanted Victim #1's legs broken, and Shalash responded, "well, no," and continued that he would like to receive his money from Victim #1. [*Id.*] Later still, Shalash once again brought up the "friend" who told had apparently asked Shalash whether he wanted Victim #1 "alive or dead." [*Id.*] The CHS asked Shalash again what he wanted, and when Shalash stammered, the CHS answered his own question by stating, "Your money is what you want." [*Id.*] Shalash agreed, and the CHS again expressed willingness to break Victim #1's legs. [*Id.*] In the weeks that followed, the CHS informed Shalash that the CHS had located Victim #1 and asked Shalash what he wanted the CHS to do. [*Id.* ¶ 8; DE 20: Det. Hr'g Tr. at 17-18.] Shalash told the CHS, in essence, to "do whatever you have to do to get my money back." [DE 1: Complaint ¶ 8; DE 20: Det. Hr'g Tr. at 82-83.]

Shalash and the CHS met again about these matters on April 30, 2019. That discussion turned from Victim #1 to L.E. Shalash told the CHS that L.E. owed "a lot of money" to various individuals, including several individuals from Afghanistan. [DE 20: Det. Hr'g Tr. at 20-21.] Shalash obtained photographs from Facebook depicting L.E. and and L.E.'s mother and daughter, and he showed them to the CHS. [*Id.* at 22-23.] Shalash then told the CHS that L.E. "owed several of the Afghanis several hundred thousand dollars, and that if the Afghans found him, they were going to kill him." [*Id.* at 20; *see also* DE 31: Notice at 2-3 (correcting sequence of events).] After the CHS asked to meet them, Shalash contacted Sadiqullah and asked him to join the meeting. [DE 21: Det. Hr'g Tr. at 22; DE 31: Notice at 2-3.] After Sadiqullah arrived and further explained the

circumstances to the CHS, Sadiqullah offered to pay the CHS to kill L.E. [DE 1: Complaint at ¶ 10; DE 21: Det. Hr'g Tr. at 23-25.] Sadiqullah and Shalash agreed to discuss the matter with the other Afghan individuals and try to reach an agreement among them about the CHS's payment. [DE 1: Complaint ¶ 10; DE 20: Det. Hr'g Tr. at 25-26.]

Two days later, on May 2, 2019, Sadiqullah called the CHS, told the CHS that he and his associates had "captured" L.E., and asked the CHS to come "take care" of L.E. [DE 1: Complaint ¶ 11; DE 20: Det. Hr'g Tr. at 26-27.] The FBI subsequently located and interviewed L.E., who reported that Sadiqullah, co-defendant Abdul Hadi, and a third man confronted L.E. at L.E.'s place of business and made menacing statements about L.E. and L.E.'s son. [DE 1: Complaint ¶ 12; DE 20: Det. Hr'g Tr. at 26-29.] L.E. told the FBI that the three men remained at L.E.'s business for approximately one hour before leaving. [DE 1: Complaint ¶ 12.] Sadiqullah called the CHS and claimed that they had released L.E. and were once again looking for L.E. [DE 1: Complaint ¶ 11; DE 20: Det. Hr'g Tr. at 27.] The following day, May 3, 2019, Shalash contacted the CHS through social media and provided L.E.'s phone number to the CHS. [DE 1: Complaint ¶ 13; DE 20: Det. Hr'g Tr. at 29-30.]

Based on these events, a criminal complaint was filed charging Shalash with conspiring to use interstate facilities in the commission of a murder for hire scheme, in violation of 18 U.S.C. § 1958. [DE 1: Complaint.] On May 22, 2019, a grand jury returned an indictment charging Shalash with violating § 1958 and also conspiring to kidnap L.E. and L.E.'s family, in violation of 18 U.S.C. § 1201(c). [DE 27: Indictment at ¶¶ 1-4.] The indictment alleges specifically that Shalash: (1) knew that the CHS (identified as

"Person A") "had the means and inclination to kidnap and physically harm other individuals to collect unpaid debts"; (2) knew that Sadiqullah wanted to kill L.E. over an unpaid debt; and (3) "introduced Sadiqullah to Person A and informed Sadiqullah that Person A could 'help' him." [*Id.* at ¶ 2(a).] The indictment also alleges that Shalash advanced the objectives of this conspiracy by giving the CHS identifying information about L.E. and L.E.'s family. [*Id.* at ¶ 2(e).]

The nature and circumstances of these offenses warrant pretrial detention. Each offense is a conspiracy to physically harm another person. Shalash himself took several overt steps in furtherance of each conspiracy, by introducing the CHS to Sadiqullah, facilitating their discussions, and providing photographs and a phone number to help the CHS locate L.E. Shalash did each of these things under the apparent belief that the CHS would kidnap L.E. or a member of L.E.'s family and that the CHS would ultimately murder L.E. The objective of each conspiracy was a federal felony containing an element that involved the use of physical force against the person of another. *See* 18 U.S.C. § 1201(a) (prohibiting seizing, confining, kidnapping, abducting, and carrying away another person); 18 U.S.C. § 1958(a) (requiring intent that a murder be committed in violation of federal or state law). Both offenses are thus "crimes of violence," as that term is defined in 18 U.S.C. § 3156(a)(4). This factor is entitled to significant weight in the detention calculus. *See* 18 U.S.C. § 3142(g)(1); *United States v. Stone*, 608 F.3d 939, 947 (6th Cir. 2010) ("In terms of dangerousness, Congress also thought it was especially significant if the charges include 'a crime of violence' . . . .").

Furthermore, the kidnapping charge establishes a presumption of detention. *See* 18 U.S.C. § 3142(e)(3)(E) ("an offense involving a minor victim under section 1201").[1] This presumption, while rebuttable, would weigh further in favor of the Shalash's pretrial detention. *See Stone*, 608 F.3d at 945-46 ("[T]he presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial.").

In short, nothing about the nature and circumstances of the charged offenses suggests that a combination of release conditions could remediate the risk to L.E. and others involved in these events.

   2. Weight of the Evidence

The weight of the evidence also favors detention. The Sixth Circuit instructs that "[t]his factor goes to the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt." *Stone*, 608 F.3d at 948. Under this standard, the Magistrate Judge appropriately declined to consider Shalash's defenses to the murder for hire plot charged in the complaint. [DE 21: Detention Order at 9.] Under 18 U.S.C. § 3142(g)(2), the inquiry is not whether there is probable cause to find that Shalash participated in this conspiracy (although the intervening indictment certainly establishes that and more). Instead, the question is whether the weight of the evidence establishes that

---

[1] The § 1201 violation was not charged in the complaint or considered at the detention hearing, and so the Magistrate Judge considered this to be a nonpresumption case. The indictment does not specify the ages of the kidnapping targets. The government hereby proffers that the targeted member of L.E.'s family was a minor, and the government would present the Court with further information about this fact if needed.

Shalash is a danger to another person. As discussed above, the Magistrate Judge heard evidence that Shalash helped to contrive and then assisted a scheme to murder L.E. because of unpaid debts that L.E. owed to several individuals. This evidence of Shalash's actions leads to the conclusion that release conditions could not assure L.E.'s safety.

Shalash's anticipated entrapment defense, to the extent it is necessary to consider it, does not change this conclusion. Shalash makes much of TFO Jackson's concession that it was "possible" that Shalash made statements rejecting the idea of violence up to a dozen times. [DE 25: Mot. to Revoke Det. Order at 3.] Even if these statements truly numbered a dozen, the evidence nonetheless also established that Shalash coupled them with words and actions that implicitly requested the violence he expressly claimed to reject. For instance, when discussing Victim #1, it was Shalash who introduced his "friend's" suggestion that Victim #1 could be brought "alive or dead just to convey the message." [DE 1: Criminal Complaint at ¶ 7.] But, when the CHS then explored the possibility of breaking Victim #1's legs, Shalash rejected the express proposal. [*Id.*] A factfinder would have ample reason to conclude that Shalash was guardedly requesting the CHS to exact violent payback.

Shalash's entrapment defense also has diminished relevance because most, if not all, of his express refusals concerned the prospect of violence to Victim #1, who was not the target of the charged conspiracy. [DE 1: Complaint ¶ 7; DE 20: Det. Hr'g Tr. at 52-56.] Shalash suggests that he also rebuffed the notion of violence to L.E. [DE 25: Mot. to Revoke Det. Order at 10-11.] The only record support for this is a soliloquy in which Shalash's counsel posits that there were "statements that I would consider to be Mr. Shalash

either declining or rebuffing or otherwise expressing some disinclination towards harming either Victim 1 or Victim 2." [DE 20: Det. Hr'g Tr. at 53.] Evidence of Shalash's actions contradicts this assertion. Shalash himself told the CHS about Sadiqullah and his associates, whom Shalash volunteered would "kill" L.E. if they found him. [*Id.* at 20.] Shalash himself volunteered L.E.'s contact information to the CHS, believing the CHS to be a hitman. [*Id.* at 29-30.] This evidence establishes Shalash as a danger to L.E., and an unsubstantiated suggestion that Shalash "rebuffed" express discussions of violence to L.E. cannot overcome it.

Shalash's other criticisms of the evidence warrant only brief responses. Shalash argues that the FBI's surveillance produced no video confirmation of his presence during the part of the April 30 meeting when Sadiqullah overtly asked the CHS to kill L.E. [DE 25: Mot. to Revoke Det. Order at 7-8.] This is true, but beside the point. Again, evidence was presented that Shalash knew that Sadiqullah and his associates wanted to kill L.E. and arranged a meeting between the Sadiqullah and the CHS to discuss this same matter. Shalash also argues that the Magistrate Judge failed to consider the "absurdity" of Shalash wanting to kill a person who owed a debt. [DE 25: Mot. to Revoke Det. Order at 10.] Evidence was presented that Shalash himself articulated the rationale for killing a debtor: "to convey the message." [DE 1: Criminal Complaint at ¶ 7.]

Shalash's objections do not overcome the evidence weighing strongly in favor of a conclusion that Shalash posed a substantial danger to L.E.

      3.  <u>Danger to Any Person Posed by Release</u>

As discussed above, the offenses charged and the evidence supporting those charges established that Shalash posed a substantial danger to the target of his murder for hire plot, L.E. The Magistrate Judge rightly also considered Shalash's potential danger to other individuals involved in these events, including Victim #1 (whom Shalash believed owed him a substantial debt) and the CHS (who provided most of the evidence against Shalash). [DE 21: Detention Order at 11.] These concerns led to the "obvious conclusion that a person capable of one contract murder would be capable of another." [*Id.* (quoting *United States v. Ross*, 2007 WL 1295995, at *5 (W.D. Mich. April 6, 2007)). The Magistrate Judge considered release conditions that could potentially mitigate these risks, including GPS monitoring, home detention, and requiring Shalash to reside with or report to third party custodians who testified at the detention hearing. [*Id.*] After weighing all of this, the Magistrate Judge concluded that no set of release conditions would sufficiently mitigate the risk to L.E. and potentially to Victim #1 and the CHS. [*Id.*]

The Magistrate Judge's conclusion was unavoidable. Despite Shalash's protestations that he "rebuffed" the possibility of violence, he repeatedly brought up the notion of harm to Victim #1 and to L.E. He was fully cognizant that the CHS represented himself as able and willing to do this harm. He knew that Sadiqullah and the others wanted to kill L.E. He arranged a meeting between the CHS and Sadiqullah. He provided information to help the CHS identify and locate L.E. and L.E.'s family. Shalash's actions reveal that he countenanced the prospect of violence to L.E. And, significantly, they also reveal that he sought to accomplish this violence through an intermediary. Under these

facts, Shalash poses a significant risk of substantial physical harm to L.E. and others. No set of release conditions exists that can counterbalance the possibility and gravity of this potential harm. Home detention, electronic monitoring, and third party stewardship could not prevent Shalash from engaging another intermediary to eliminate the witnesses against him. Pretrial detention is the only way to reasonably assure the safety of L.E. and the other individuals involved.

### B.   Risk of Nonappearance

The Magistrate Judge also determined that conditions could not be imposed that would reasonably assure Shalash's appearance for future court proceedings. [DE 21: Detention Order at 4-6.] The conclusion was based on: (1) Shalash's "extensive connections abroad", including family residing in the West Bank; (2) Shalash's frequent and widespread international travel; (3) the substantial maximum penalties for the murder for hire offense charged in the complaint; and (4) a large amount of cash located at Shalash's residence and unreported during Shalash's pretrial services interview. [DE 21: Detention Order at 4-6.] These factors speak for themselves and collectively outweigh Shalash's ties to the Eastern District of Kentucky.

Shalash nevertheless objects to the Magistrate Judge's determination on three grounds. First, Shalash argues the Magistrate Judge should have concluded that his prospective entrapment defense would mitigate the flight risk. [DE 25: Mot. to Revoke Det. Order at 12.] Shalash's effort to graft this issue into a flight risk analysis is based on a First Circuit decision affirming a defendant's release partly because he proffered an entrapment defense "that could exonerate him and that will be undercut by fleeing." [*See*

*id.* (quoting *United States v. O'Brien*, 895 F.2d 810, 816 (1st Cir. 1990)).] With respect to the First Circuit, one could just as easily conclude that a defendant would flee to avoid the substantial personal risks associated with standing trial and litigating that defense. This is particularly the case where, as here, the prospective entrapment defense is not entirely supported by the facts and would be only marginally relevant to Shalash's words and actions concerning L.E. [*See supra* Section A.2.]

Second, Shalash claims that the Magistrate Judge's consideration of his recurrent international travel was "tantamount to a First Amendment violation," since Shalash traveled for "religious pilgrimages, faith-based conferences, or family events." [DE 25: Mot. to Revoke Det. Order at 13.] The Detention Order relied on Shalash's international travel, not his exercises of religious freedom. [DE 21: Detention Order at 4-5.] Some of that travel may have been incidental to attendance at a religious event, but that does not confer First Amendment protection over the act of traveling abroad. The Magistrate Judge's consideration of this factor was appropriate and necessary.

Third, Shalash takes issue with the Magistrate Judge's consideration of Shalash's failure to report what he terms "a comparatively minute amount of cash" during his pretrial services interview. [DE 25: Mot. to Revoke Det. Order at 13.] This "minute amount of cash" was, in fact, over $100,000 in currency located during a search of Shalash's residence on May 8, 2019. [DE 20: Det. Hr'g Tr. at 37.] When asked the following day about his net worth, Shalash reported his traceable assets, including bank accounts, vehicles, businesses, and his residence, but he made no reference to this stockpile of cash. [DE 21: Detention Order at 5-6.] Even though that cash was then in FBI custody, it is implausible

to suggest that Shalash did not consider it part of his net worth. Unreported cash raises the suspicion of nonappearance risk, because it is liquid, untraceable, and could easily be used to finance a flight. The Magistrate Judge appropriately considered this in combination with the other information presented about Shalash's history and characteristics.

The Magistrate Judge's conclusion that release conditions could not reasonably mitigate the nonappearance risk was the right decision under the circumstances. The grand jury's intervening indictment has only raised the stakes for Shalash and thereby increased the potential flight risk. The Detention Order relied in part on the ten-year statutory maximum penalty for the offense charged in the complaint, characterizing this as a potential life sentence in light of Shalash's current age and health problems. [DE 21: Detention Order at 5.] The indictment has added a kidnapping charge, which carries a maximum penalty of life imprisonment. [DE 27: Indictment at ¶¶ 1-2.] Shalash's motivation to flee is even higher now than it was at the time of the detention hearing. No combination of release conditions could reasonably assure his appearance at future court proceedings.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court affirm the Magistrate Judge's order detaining Mahmoud Shalash.

>Respectfully submitted,
>
>ROBERT M. DUNCAN, JR.
>UNITED STATES ATTORNEY

By: /s/Andrew T. Boone
Andrew T. Boone
Assistant United States Attorney
260 W. Vine Street, Suite 300
Lexington, Kentucky 40507-1612
(859) 685-4841
FAX: (859) 233-2747
andrew.boone2@usdoj.gov

## **CERTIFICATE OF SERVICE**

      On June 5, 2019, I electronically filed this document through the ECF system, which will send notice to counsel of record.

                                          /s/Andrew T. Boone
                                          Assistant United States Attorney